Adam B. Wolf (CA Bar No. 215914)
Catherine Cabalo (CA Bar No. 248198)
Tracey B. Cowan (CA Bar No. 250053)
PEIFFER WOLF CARR KANE & CONWAY
A Professional Law Corporation
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: 415.766.3592
Facsimile: 415.402.0058
Email:  awolf@pwcklegal.com
        ccabalo@pwcklegal.com
        tcowan@pwcklegal.com

*Attorneys for Plaintiff Lucia Greco*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCIA GRECO,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.; RASIER, LLC; AND RASIER-CA, LLC.<br><br>Defendants. | Case No.<br><u>Civil Rights</u><br><br>**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**<br><br>1.  Violations of Title III of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*)<br>2.  Violations of the California Unruh Act (Cal. Civil Code § 51 *et seq.*) |

COMES NOW Plaintiff LUCIA GRECO in this civil rights action and hereby complains of Defendants UBER TECHNOLOGIES, INC.; RASIER, LLC; and RASIER-CA, LLC (together "Defendants") as follows:

## **INTRODUCTION**

1.      This is a civil rights action involving the lack of disabled access to the services provided by Defendant Uber Technologies, Inc. ("Uber"), a company that provides rideshare taxi services throughout California.

2.      Plaintiff Lucia Greco ("Plaintiff" or "Ms. Greco") is visually impaired and uses a guide dog. Because she cannot drive, Plaintiff must rely on public transportation, taxis, and rideshare taxi services such as that provided by Uber.

3.      Under Title III of the Americans with Disabilities Act of 1990 ("ADA"), refusal to serve a blind or visually impaired person on the basis of their guide dog is actionable discrimination.  Uber, together with its subsidiaries operating in California, Defendants Raiser, LLC and Raiser-CA, LLC, (collectively "Uber" or "Defendants")[1] are covered entities under the ADA because they are private businesses primarily engaged in the transportation of people, whose business affects commerce.

4.      Uber engaged—and continues to engage—in prohibited discriminatory practices by failing to properly train its drivers and permitting them to deny access to Ms. Greco when, as always, she is with her guide dog. Uber has failed to make reasonable modifications in its policies, practices, or procedures to avoid continued discrimination against blind or visually impaired riders like Ms. Greco. Uber is also liable for Uber drivers because 1) Uber has a non-delegable duty to comply with the ADA, and 2) Uber Drivers are Uber's agents and employees. Uber is thus both directly and vicariously liable for violating the ADA each time one of its drivers denied Ms. Greco access to a ride on the basis of her guide dog.

5.      At all times relevant herein and continuing, Ms. Greco was denied equal protection of the law and was denied civil rights under state and federal law. Uber's discriminatory policies and continued failure to accommodate blind or visually impaired riders with guide dogs deny full and equal access to individuals with visual disabilities, including Ms.

---

[1] Uber Technologies, Inc. is a holding company for its wholly-owned subsidiary entities Raiser, LLC and Raiser-CA-LLC.  On information and belief, the subsidiary entities collect rideshare revenues and pay Uber drivers, with revenues from these arrangements ultimately flowing to the parent company.  Because Ms. Greco alleges that the companies work together in a concerted scheme, she refers to the three companies acting in concert as "Uber" and alleges the claims herein against each of the companies individually.  The precise roles that each of the companies play in this scheme are best known to the Defendants and will be the subject of discovery in this action.

Greco, in violation of the ADA and California's analog state statute, the Unruh Civil Rights Act ("Unruh Act").

## JURISDICTION AND VENUE

6.     This Court has jurisdiction of this action pursuant to 28 USC § 1331 for violations of the ADA, 42 U.S.C. §§ 12101 *et seq.*  Pursuant to supplemental jurisdiction, attendant and related causes of action arising from the same facts are also brought under the Unruh Act, California Civil Code §§ 51, 52.

7.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)-(c). The majority of the events complained of herein took place in San Francisco, California, or the surrounding Bay Area. Additionally, Uber is headquartered and registered to do business in San Francisco, California. It manages fleets of vehicles providing transportation services in the Northern District of California, employs (either directly or through the subsidiary Defendants named herein) drivers and other employees within the Northern District of California, and sells transportation services within the Northern District of California.

8.     Uber is subject to personal jurisdiction in the Northern District of California. Uber has been and is committing the acts alleged herein in the Northern District of California, has been and is violating the rights of consumers with disabilities in the Northern District of California, and has been and is causing injury to consumers with disabilities in the Northern District of California.

## PARTIES

9.     Ms. Greco is a visually-disabled citizen of the State of California. She is domiciled within the Northern District of California.

10.     Defendant Uber Technologies, Inc. is a for-profit transportation company incorporated in Delaware and headquartered in San Francisco, California. With its subsidiaries, Defendants Raiser, LLC and Raiser-CA, LLC, Uber's primary business is the promotion and provision of transportation services. Uber uses its smart phone software application to arrange

rides between passengers and its fleet of drivers in much the same way that a taxi dispatch arranges rides for customers.

11.     Defendants Rasier, LLC, and Rasier-CA, LLC are wholly-owned subsidiaries of Defendant Uber Technologies, Inc. that operate within the state of California. Upon information and belief, these subsidiaries are required parties pursuant to Federal Rule of Civil Procedure 19(a)(1) because in their absence, the court cannot accord complete relief from Uber Technologies, Inc. alone.

12.     Plaintiff is informed and believes that at all times relevant to this action, Defendants Rasier, LLC and Rasier-CA, LLC were acting as Uber Technologies, LCC's agents.

**FACTUAL ALLEGATIONS**

**Uber's Operations**

13.     Uber operates a rideshare app that allows users to request transportation and then connects them with a vehicle and a driver.  Uber operates in scores of metropolitan cities across the US and claims to have over two hundred thousand drivers operating in California alone.

14.     Uber's services are available to people who download the application on their smartphones and open an account with a credit card.  To use Uber, an individual must either (1) create a user account, and provide Uber with his phone number, credit card information, and email address; or (2) travel as the guest of an individual with an Uber user account.

15.     The customer then submits a request on behalf of himself and other passengers through Uber's mobile software application.  Uber provides an application for riders (the rider-side App) and a separate application for drivers (the driver-side App).  Because these twin applications are meant to and do interact with one another, providing a means of allowing Uber to control all substantive and financial interactions between Uber riders and drivers, the dual applications are referred to herein interchangeably as the "Uber App" or the "App".

16.     Once Uber identifies the vehicle that will provide the customer with transportation, Uber notifies the customer via text message or through the App. The notification includes vehicle and driver identification information and an estimated time of arrival.  On the

driver-side, Uber notifies the driver of the location of the rider and their first name (or a name chosen by the rider).  When the vehicle has arrived at the rider's location, Uber notifies the customer, and the customer and any additional passengers may board the vehicle. Additionally, up until the moment that the rider enters the vehicle, she may communicate with her assigned driver via text messages sent directly through the Uber App.

### Uber is Primarily Engaged in Transportation

17.     While recently Uber has also become engaged in some other types of ventures, namely food delivery and freight shipping, the vast majority of its investment, profits, and promotional activities are occupied by its ride-sharing, i.e., transportation, services.

18.     Uber's twin consumer-facing ridesharing applications are not the only technology it has developed to optimize its transportation network.  It also uses proprietary programs and algorithms to match supply and demand, such as predicting where and when peak rider volume will occur, optimizing match-pairs between drivers and riders, and setting dynamic ride pricing. In addition, Uber has created routing and payments technologies that provide the seamless service its riders and drivers have come to rely upon.  All of these projects represent substantial investment in Uber's network for the offer and procurement of personal transportation.

19.     None of Uber's other, non-personal transportation, applications are nearly as profitable, popular, or long-standing as its rideshare applications. According to its public filings, in 2019, Uber's gross bookings for its rideshare services were nearly $50 billion. By contrast, gross bookings for its next largest segment, Uber Eats, were under $15 billion. Gross bookings for freight and Uber's other offerings were less than $1 billion. Uber's 2019 revenues from its rideshare services were close to $11 billion, while revenues from all other aspects of its business were less than $3.5 billion.

20.     Uber provides "specified public transportation services," as that term is defined by 42 U.S.C. § 12184(a), via the drivers that Uber's subsidiaries pay for providing rides to Uber riders ("Uber Drivers").

**Uber's Operations Affect Commerce**

21.     Uber's transportation services have a demonstrable and substantial effect on commerce.  Indeed, as noted above, Uber's 2019 revenues for rideshare services were more than $10 billion. In addition to Uber's own revenues, Uber drivers have earned many billions of dollars in service fees and tips through the Uber App between 2015 and present day.

22.     Uber's Initial Public Offering in May 2019 was the largest in the preceding five years. Uber is now traded publicly on the stock market.

23.     Uber has claimed in public filings that it has a leading ridesharing category position in every major region of the world where it operates, which includes 69 countries.

**Uber Drivers Are Uber's Employees**

24.     Under California law, rideshare drivers are the rideshare company's employees. Even if that were not so, the details of Uber's arrangements with its drivers reflects an employer-employee relationship, such that Uber is responsible for its drivers' conduct.

25.     Uber chooses drivers based on criteria and requirements developed by Uber and closely monitors and controls interactions between its drivers and customers. Uber's customers request rides through Uber's App, and Uber identifies an available driver to transport each customer, bills customers for their rides in Uber vehicles, provides customers with receipts, and handles inquiries and complaints from customers concerning Uber's drivers and taxi services.

26.     The work that Uber Drivers perform for Uber—providing rides to Uber Riders—is central to and an indispensable part Uber's primary business, which is operation of its transportation-oriented rideshare business.  Driving for Uber is not an independently-established trade, but rather is a position that only exists because Uber itself created the rideshare market.

27.     Uber controls nearly every aspect of its drivers' interactions with Uber riders. Uber maintains a slew of information about each rider, but refuses to provide such information to its drivers, giving each driver only a first name—which may not even be the rider's legal name—for purposes of identifying the rider.  Riders and drivers can also locate each other by matching up lights in colors that Uber provides.  Uber also controls the drivers' acceptance of each

individual ride, conditioning employment benefits and incentives on driver acceptance rates. Once the ride is in progress, Uber provides turn-by-turn directions to the rider's destination to the driver by means of its own app.  If the rider wishes to change their destination once the ride is in progress, he or she must enter the requested change in the App. Uber also controls the financial transaction associated with each ride that Uber drivers provide to customers—Uber riders are not permitted to pay their driver directly but must do so through the Uber app.

28.     The act of driving passengers is not a specialist occupation, does not require a high degree of skill, and does not require substantial supervision.  Nevertheless, Uber exercises substantial control and direction in connection with Uber Driver's provision of rideshare services, both under the contract for the performance of such work and in fact.

29.     Though Uber drivers can technically choose which hours to work, Uber drivers are prohibited from certain privileges unless they achieve certain employment-based thresholds, which can only be achieved by driving for substantial amounts of hours per week.  Moreover, Uber drivers have no ability to change the amount of money Riders are charged for each ride, which is determined based on Uber's own proprietary dynamic-pricing algorithm.  Per this algorithm, Uber decides the times of day and areas of a given city that will be subject to higher prices.  If a driver wants to take advantage of these higher prices, it must provide its services in the areas and during the times that have been pre-determined by Uber, which are communicated to the driver through the App.  Additionally, Uber has relationships with companies that rent cars to Uber drivers unable to provide or use their own.  Uber also operates various regional "Greenlight Hubs" where Uber drivers can have their Uber vehicles serviced or inspected.

30.     In addition to incentive-based controls, Uber also regulates its drivers by conducting background checks and setting requirements for drivers' age, experience, licensing, and driving records. Uber instructs the drivers on the expected quality of the rides—issuing community guidelines, making recommendations about the amenities to stock in the vehicles and the radio station choice, and imposing cleanliness requirements. Uber also requires drivers to limit the number of times they cancel a requested ride or deny a ride request.  Uber's guidelines

further forbid drivers from picking up any riders that did not book their travel through the Uber App.  Uber even regulates the acceptable topics of conversation that a driver may have with their assigned riders.  Failure to stay within Uber's strict guidelines regarding these requirements can result in termination from the platform.

31.     Uber routinely provides Uber drivers with turn-by-turn directions to customers' destinations.  Even when Uber drivers do not use Uber's navigational tools, for each trip that each Uber driver provides, Uber monitors and records nearly every detail of the trip, and Uber uses this data to evaluate drivers. Furthermore, Uber collects written feedback from every customer concerning each Uber driver's performance after every trip.

32.     In addition to the above requirements, Uber also has special guidelines for its drivers regarding taking riders with service animals. Specifically, Uber requires drivers to agree to Uber's "Service Animal Policy" and acknowledge their legal obligations under the ADA and state law.  Uber's Service Animal Policy stipulates that its drivers "CANNOT lawfully deny service to riders with service animals because of allergies, religious objections, or a generalized fear of animals." However, other than providing its drivers with its Service Animal Policy, Uber does not provide sufficient functional training to its drivers regarding the drivers' and Uber's obligations under the ADA to prevent frequent ride denials.

33.     If a rider submits a complaint alleging that a driver has an issue related to his or her service animal—including ride cancellations or other harassment, Uber has a "specialized support team" that investigates the issue.  Per Uber's policy, if the Uber support team determines that a driver "knowingly refused to transport a rider with a service animal because of the service animal," the driver "will be permanently prevented from using" the Uber app.  Uber makes this decision in its "sole discretion."  Moreover, under Uber's policy, if Uber receives multiple "plausible complaints" that a driver "refused to transport a rider with a service animal" that driver will be terminated from the Uber App, "regardless of the justification offered."

34.     Per these guidelines, Uber is in complete control of this aspect of its drivers' performance.  Indeed, Uber claims that discrimination by its drivers is "not tolerated" and that

drivers are subject to "internal investigation" and "appropriate action" including termination for failure to abide by Uber's policies.  In the paperwork it provides to all drivers, Uber lists failure to comply with state, federal, and local laws regarding the transportation of service animals as a basis for Uber to temporarily block or deactivate a driver's account.  Uber can and does suspend –and even terminate—drivers who break its rules, including its rules regarding accessibility for riders with service animals.  However, on multiple occasions, Uber has neglected to terminate an offending driver's association with the App.  On other occasions, Uber has opted in its discretion not to appropriately follow up, in clear violation of its own policies. Indeed, on information and belief, Ms. Greco alleges that Uber's support team knowingly coaches drivers on how to get out of an allegation of discrimination, and often utilizes its discretion to excuse blatant discrimination so as to avoid having to terminate an Uber Driver from the platform.

35.     As described herein, Uber is on notice that its policies—taken together with its supervision and administration of those policies—are not sufficient to prevent and forestall unreasonable discrimination on the part of its drivers.

**Ms. Greco's Claims**

36.     Lucia Greco is visually impaired and requires a service animal as an accommodation for her visual disability.  Because she cannot drive, Ms. Greco relies on public transportation, taxis, and rideshare services like Uber to get around.  Ms. Greco has brought this action because she has been denied service repeatedly by Uber drivers on the basis of her guide dog.

37.     On dozens of occasions, after Ms. Greco has arranged a ride through the Uber App, the assigned driver has cancelled the ride upon learning Ms. Greco had a guide dog, solely because they do not want to transport her guide dog.  Being stranded and forced to make other arrangements has made Ms. Greco feel excluded and disregarded as a disabled person.  Further, these denials have deeply embarrassed and humiliated her, making her feel marginalized and dehumanized.  The denials have occurred at all times of day and in all types of weather.

38.     Ms. Greco is often left standing on the side of the road due to a ride denial, which places her in a vulnerable situation.  Sometimes she has been denied by different drivers multiple times a week, or even multiple times a day, highlighting the pervasiveness of the problem.  As a result of these service denials, Ms. Greco has been stranded without a ride, repeatedly delayed on her schedule, and forced to expend more money on her travels.

39.     Because of the denials, Ms. Greco is frequently late to work or other appointments and consequently never has the certainty of knowing that she will be able to arrive at a given location on time.  In short, Ms. Greco has suffered extreme difficulty because Uber drivers refuse to provide her with rides due to her service animal.

40.     Adding insult to injury, Ms. Greco has frequently been charged fees by Uber for these cancellations, which she then has to dispute through follow-up contact with Uber.

41.     In addition to being denied service by Uber because of her guide dog, Ms. Greco has also been wrongfully charged for cleaning services on multiple occasions because of her guide dog and has been subjected to discrimination in the form of harassment and unprofessional behavior by Uber drivers who appear to have no training or understanding of the legal requirements of the ADA.

42.     Ms. Greco has documentation of being denied rides by Uber drivers because of her guide dog starting on March 28, 2018. A review of Plaintiff's records indicates that, to date, she has been denied a ride or subjected to discrimination because of her service animal on *at least* 32 occasions.  Specifically, Ms. Greco has records establishing her rights were violated because she was denied an Uber ride by an Uber driver, where such denial was made on the basis that the driver did not want to accommodate Plaintiff's guide dog in the vehicle, on or about at least the following dates: 3/28/2018, 4/25/2018, 6/20/2018, 7/10/2018, 8/8/2018, 9/14/2018 (twice), 9/20/2018, 10/9/2018, 10/12/2018, 10/31/2018, 11/16/2018, 12/10/2018, 1/31/2019, 2/27/2019, 3/21/2019, 3/22/2019, 3/24/2019, 4/8/2019, 4/15/2019, 4/16/2019, 5/6/2019, 5/14/2019, 5/20/2019, 6/25/2019, 7/9/2019, 7/15/2019, 2/20/2020, 2/22/2020, and 3/11/2020.

43.     Ms. Greco believes there are likely numerous additional violations that occurred within the statute of limitations period. Uber should have records of every such violation at its disposal, and thus it is in the best position to determine the precise number of discriminatory acts at issue.

44.     Ms. Greco routinely reports this discrimination to Uber. Uber, however, has repeatedly failed to respond to Plaintiff's customer complaints about service animal discrimination in a timely manner.  Uber has also failed to notify Plaintiff about the outcome of Uber's investigation into several incidents, including whether the respective driver has been permanently removed from Uber's system.

45.     Despite Uber being on notice of the situation, Ms. Greco has continued to be denied rides frequently up to the present.  On multiple occasions, Uber has acknowledged that a driver's privileges to use the App needed to be revoked due to the driver refusing to provide service to Ms. Greco and her guide dog.  And yet, the discrimination has continued to this day and it does not appear Uber has made sufficient efforts to reevaluate its policies to ensure that blind and visually impaired riders are not denied rides because of their guide dogs.

46.     Uber has failed to permanently remove drivers from the platform even after finding that the driver knowingly denied service to someone with a service animal because of their service animal.

47.     Uber has failed to permanently remove drivers who are alleged to have refused service to blind and visually impaired riders with guide dogs more than once, regardless of their intent or knowledge, even when the complaints are plausible.

48.     Uber has failed to notify new drivers and existing drivers of their obligations to serve people with service animals when they sign up through the Uber App and via email reminders.

49.     Upon information and belief, Uber has failed to require all drivers to read and correctly answer questions about service animal obligations in the Uber App.

50.     In acting as herein alleged, Uber has both directly and indirectly denied Ms. Greco full and equal access to the goods, services, facilities, privileges, advantages, and accommodations offered by Uber via its rideshare service.

51.     In acting as herein alleged, Uber caused Ms. Greco to experience difficulty, physical and emotional distress, frustration, fear, anxiety, humiliation, inconvenience, embarrassment, and out-of-pocket losses.  Uber's discrimination is ongoing and continuous and results in ongoing and irreparable injury to Ms. Greco. Uber's discrimination against Ms. Greco is certain to occur on a regular basis following the filing of this Complaint. Therefore, Ms. Greco reserves, and will seek to supplement this Complaint at the time of trial as to subsequent events, according to proof.

**The Arbitration Agreement**

52.     Ms. Greco has recently been informed that there is an arbitration provision contained in Uber's "Terms of Use Agreement" between Uber and riders using the Uber App. Ms. Greco does not here concede the enforceability of the arbitration provision against her. Nevertheless, in compliance with the directives of this arbitration provision, on March 27, 2020, Ms. Greco filed a Demand for Arbitration with the American Arbitration Association ("AAA") for damages resulting from the incidents identified above.

53.     On April 18, 2020, AAA notified Ms. Greco and Uber that it was declining to administer Ms. Greco's claim because Uber "failed to comply with the AAA's policies regarding consumer claims." *See* Exh. A.

54.     An actual controversy has arisen and now exists between the parties concerning their respective rights, duties and obligations under federal and state law. Accordingly, Plaintiff is entitled to declaratory relief.

**FIRST CLAIM:**

**VIOLATIONS OF THE ADA, TITLE III**

**[42 USC §§ 12101 *et seq.*]**

**(Alleged against All Defendants)**

55.     Ms. Greco repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Compliant and incorporates them herein as if separately repled.

56.     Ms. Greco is, and at all times relevant herein was, a qualified individual with a disability within the meaning of the ADA and the Department of Transportation ("DOT") regulations implementing the ADA, as she has impairments that substantially limit one or more major life activities.

57.     Uber is a covered entity under the ADA because it is a transportation company—it is "primarily engaged in the business of transporting people" and its "operations affect commerce" under 42 U.S.C. § 12184. Uber has non-delegable duties under the ADA to provide transportation to qualified individuals with disabilities, including Ms. Greco.

58.     More specifically, Uber (either directly or indirectly through its employee drivers) owns, operates, or leases vehicles providing taxi service and specified public transportation within the meaning of Title III of the ADA and its implementing regulations. Furthermore, Uber operates a "demand responsive system" as that term is defined by the ADA and DOT regulations.

59.     Uber's acts and omissions as herein alleged have violated Ms. Greco's rights under the ADA and its implementing DOT regulations. Uber is both directly and vicariously liable for the many violations of Plaintiff's rights described herein including, *inter alia*:

60.     Uber is vicariously liable under agency principles and because it has a non-delegable duty under the ADA for each time its drivers denied Ms. Greco public transportation services based on her disability.

61.     Uber is vicariously liable under agency principles and because it has a non-delegable duty under the ADA for each time its drivers denied Ms. Greco the opportunity to use transportation services intended for the general public, when she was capable of using those services.

62.     Uber is vicariously liable under agency principles and because it has a non-delegable duty under the ADA for each time its drivers imposed or applied eligibility criteria that screen out or tend to screen out individuals—like Ms. Greco—who use service animals as an accommodation for a visual disability from fully enjoying the specified public transportation services provided by Uber, despite the fact that excluding these individuals is unnecessary for the provision of the transportation services being offered.

63.     Uber is directly liable for failing to make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals—like Ms. Greco—who use service animals as an accommodation for a visual disability, despite the fact that Uber cannot demonstrate that making the necessary modifications would fundamentally alter the nature of the transportation services it offers.

64.     Uber is directly liable for failing to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals, despite the fact that taking such steps would not fundamentally alter the nature of Uber's services and would furthermore not constitute an undue burden on Uber or its employees.

65.     Uber is directly liable failing to ensure that its drivers are "trained to proficiency" to interact with and provide services to blind and visually impaired riders with guide dogs.

66.     The acts and omissions of Uber set forth herein were in violation of Ms. Greco's rights under the ADA and its implementing regulations.  As a result of these acts and omissions, Ms. Greco has been subjected to repeated and continuing harm.

67.     Plaintiff is entitled to the remedies, procedures, and rights set forth in 42 U.S.C. § 12205.

## SECOND CAUSE OF ACTION:

## VIOLATION OF UNRUH CIVIL RIGHTS ACT

### [Cal. Civil Code §§ 51 *et seq.*]

### (Alleged Against All Defendants)

68.     Ms. Greco repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein by reference as if separately repled hereafter.

69.     Uber is a business establishment within the meaning of the Unruh Act.

70.     Uber violated the Unruh Act by its acts and omissions, as follows:

  A. Denying, aiding, and/or inciting the denial of Ms. Greco's rights to full and equal use of the transportation accommodations, advantages, facilities, privileges, and/or services offered by Uber to members of the public;

  B. Failing to modify policies and procedures as necessary to ensure Plaintiff full and equal access to the accommodations, advantages, facilities, privileges, and/or services of Uber; and

  C. Violating the ADA, as alleged above in the First Cause of Action, a violation of which is violation of the Unruh Act.

71.     Ms. Greco has experienced barriers related to Uber's services, policies, and procedures, all of which have caused her major difficulty, discomfort and embarrassment. Plaintiff suffered physical, mental, and emotional damages, including statutory and compensatory damages, according to proof.

72.     Further, each violation of the ADA (as pled in the First Claim) also constitutes a separate and distinct violation of California Civil Code § 51(f), thus independently justifying an award of damages pursuant to California law, including but not limited to Civil Code § 52(a).

73.     With respect to Uber's violations of the Unruh Act that are not predicated on violations of the ADA, Uber's behavior was intentional: it was aware of and/or was made aware of its duties to refrain from establishing discriminatory policies and barriers that prevent persons with disabilities like Ms. Greco from obtaining full and equal access to Uber's services. Uber's discriminatory practices and/or policies that deny full enjoyment of its transportation services to persons with visual disabilities indicate actual and implied malice and conscious disregard for Ms. Greco's rights.

74.     At all times relevant, Uber is and was well aware of its legal duties outlined in this complaint. Yet even after Ms. Greco's complaints, Uber continued its discriminatory practices and/or policies. Accordingly, Uber has engaged in willful affirmative misconduct in violating the Unruh Act, which warrants the awarding of treble damages and punitive damages.

75.     Uber's services and its policies and procedures have not been improved. Plaintiff's injuries—and as such, damages—are ongoing so long as Uber does not modify their policies and procedures and provide fully accessible services for Ms. Greco and other persons with similar disabilities.

76.     At all times herein mentioned, Uber knew, or in the exercise of reasonable diligence should have known, that its services, policies, and practices violated disabled access requirements and standards, and had a discriminatory impact upon Plaintiff and upon other persons with similar disabilities. But Uber failed to rectify the violations, and presently continues a course of conduct in maintaining barriers that discriminate against Plaintiff and similarly-situated disabled persons.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment and the following specific relief against Uber:

1.     Issue a declaratory judgment that Uber: (a) violated Title III of the ADA and California's Unruh Act through the acts of its Drivers in failing to provide service to Ms. Greco on the basis of her service dog, and (b) directly violated Title III of the ADA and California's

16
Complaint

Unruh Act by failing to make reasonable modifications in policy and practice for Plaintiff and other persons with similar disabilities in violation of the rights of Plaintiff and other similarly-situated persons under these laws;

2.      Award to Plaintiff all appropriate damages under the Unruh Act, including but not limited to statutory, compensatory, and treble damages in an amount within the jurisdiction of the Court, all according to proof;

3.      Award punitive damages;

4.      Award all reasonable statutory attorney fees, litigation expenses, and costs of this proceeding as provided by law, including but not limited to the ADA, 42 U.S.C. § 12205; the Unruh Civil Rights Act, California Civil Code § 52; and California Code of Civil Procedure § 1021.5;

5.      Award prejudgment interest pursuant to California Civil Code § 3291;

6.      Interest on monetary awards as permitted by law; and

7.      Grant such other and further relief as this Court may deem just and proper.

Dated: April 19, 2020                    PEIFFER WOLF CARR KANE & CONWAY
                                         A PROFESSIONAL LAW CORPORATION

                                         */s/ Catherine Cabalo*
                                         BY: CATHERINE CABALO
                                         Adam B. Wolf, Esq.
                                         Catherine Cabalo, Esq.
                                         Tracey Cowan, Esq.
                                         PEIFFER WOLF CARR KANE & CONWAY
                                         A Professional Law Corporation
                                         4 Embarcadero Center, 14th Floor
                                         San Francisco, CA 94111
                                         Telephone: 415.766.3592
                                         Facsimile: 415.402.0058
                                         awolf@pwcklegal.com
                                         ccabalo@pwcklegal.com
                                         tcowan@pwcklegal.com

                                         *Attorneys for Plaintiff*
                                         *LUCIA GRECO*

Complaint

## **DEMAND FOR JURY**

Plaintiff hereby demands a jury for all claims for which a jury is permitted.

Dated: April 19, 2020

PEIFFER WOLF CARR KANE & CONWAY
A PROFESSIONAL LAW CORPORATION

*/s/ Catherine Cabalo*
BY: CATHERINE CABALO

Adam B. Wolf, Esq.
Catherine Cabalo, Esq.
Tracey Cowan, Esq.
PEIFFER WOLF CARR KANE & CONWAY
A Professional Law Corporation
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: 415.766.3592
Facsimile: 415.402.0058
awolf@pwcklegal.com
ccabalo@pwcklegal.com
tcowan@pwcklegal.com

*Attorneys for Plaintiff*
*LUCIA GRECO*

Complaint